Robert S. ABRAHAM, Daniel M.
Abraham and Matthew J.
Abraham, Plaintiffs,

v.

Sergeant Mark S. PIECHOWSKI, Sheriff
Patrick J. Fox, Waushara County Sheriff's Department and Waushara County,
Defendants.

No. 97–C–0705.

United States District Court,
E.D. Wisconsin.

Aug. 10, 1998.

## DECISION AND ORDER

ADELMAN, District Judge.

This case raises the important question of whether, when enforcing the law, a sheriff represents the county or the state, and the related question of whether, in view of Wisconsin constitutional and statutory changes, the Seventh Circuit's last pronouncement on the issue has continuing force. The issue is important because of the Eleventh Amendment. If a sheriff acts on behalf of the state rather than the county when enforcing the law, Eleventh Amendment immunity protects the sheriff from being liable for damages in federal court. I find, however, that when sheriffs perform law enforcement functions they represent the county not the state, and that sovereign immunity, therefore, does not bar this lawsuit. Nevertheless, the lawsuit fails in other respects.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On September 28, 1996, Robert S. Abraham and his sons, Daniel and Matthew, went duck hunting on the Pine River in the Town of Saxeville, Waushara County, Wisconsin. (DFOF, ¶ 1.)[1]

On the same day, Bonnie Vaughan–Kepplinger (hereinafter "Kepplinger") was visiting her summer home near the river. That afternoon, Kepplinger and a friend went canoeing down the Pine River. At approximately 2:30 p.m., the women encountered duck decoys and heard shooting they felt was directed at them. They became concerned for their safety. (DFOF, ¶ 2; RFOF, ¶ 3.) Kepplinger noticed an individual (Robert, although she did not know his name at the time) shooting from behind foliage on the bank of the river, and she called out loudly in his direction. Kepplinger says she yelled out because she was at substantial risk of physical harm and wanted the shooter to identify himself and explain what was going on. (See DFOF, ¶ 3; Kepplinger Aff., ¶ 2.) The Abraham boys say Kepplinger instead was shouting accusations that they were trespassing.[2]

David J. Bartz, Madison, WI, for Plaintiffs.

Donald L. Romundson, Green Bay, WI, for Defendants.

1. Cites to the defendant's proposed findings of fact will be identified as "DFOF". I will cite plaintiffs' responses as "RFOF" and additional findings of fact asserted by plaintiffs as "PFOF".

2. According to the Abrahams' brief, the annual

(RFOF, ¶ 3.) Plaintiffs concede, though, that at one point Kepplinger may have asked who was shooting. (DFOF, ¶ 3; RFOF, ¶ 3.)

Following her encounter with the Abrahams, Kepplinger paddled home and called the sheriff's office. Sergeant Mark Piechowski, a Waushara County sheriff's deputy, was dispatched to Kepplinger's house. Kepplinger and Piechowski then headed to the scene of the shooting; exactly when they arrived is in dispute, although the general time frame is not. The Abrahams say Piechowski showed up at about 5:00 p.m.; defendants say Piechowski arrived at Kepplinger's house at 5:36 p.m. and then proceeded to the river. (DFOF, ¶¶ 4, 5; RFOF, ¶¶ 4/5.) Kepplinger pointed out the person she thought shot at her. Piechowski had her confirm that she was sure the man was shooting at her, then asked if she wanted the man arrested for reckless use of a firearm. Kepplinger responded "yes." (DFOF ¶ 5.)

Piechowski approached Robert at that point. The parties characterize the confrontation differently. According to plaintiffs, Piechowski approached Robert aggressively, with one hand on his weapon and the other on handcuffs. Piechowski supposedly was "a foot from [Robert's] face" and said "I'll take you all in. You're all under arrest." (RFOF, ¶ 6/7.) Defendants, on the other hand, say Piechowski merely asked Robert to put his gun down and advised Robert about Kepplinger's complaint, at which point Robert denied shooting at her or her canoe. Defendants agree that Piechowski advised Robert that he was arresting him for reckless use of a firearm. But they say that only when Robert indicated he would not leave his sons alone did Piechowski reply that he then would "take them all in" and that "they were all under arrest." (DFOF, ¶¶ 6, 7.)

Kepplinger and Robert engaged in a brief colloquy with one another in the presence of Deputy Piechowski, during which Robert threatened to sue Kepplinger. Defendants say Kepplinger offered to withdraw her complaint and let the matter rest if Robert agreed to drop his threats about suing her, and that Robert seemed agreeable to that solution. (DFOF, ¶ 8.) According to defendants, Piechowski and Kepplinger then left the scene together. (DFOF, ¶ 10.) Kepplinger says she observed no improprieties by Piechowski at any time. (DFOF, ¶ 14.)

The Abrahams, on the other hand, say Kepplinger recanted her complaint three times and quit the scene. Piechowski, though, nevertheless continued to detain them for a period of ten minutes after Kepplinger left and fifteen minutes since Kepplinger last recanted her story. (RFOF, ¶¶ 9, 10.) Plaintiffs say Piechowski conducted no investigation at the scene such as interviewing them or checking their weapons to see if they had been fired. (PFOF ¶ 3.) And although Piechowski ultimately departed without handcuffing anyone, taking anyone to the sheriff's station, or citing them for any wrongdoing, at the time he left he had never indicated that the Abrahams were free to go. (PFOF ¶ 1.) Each of the plaintiffs felt that they were under arrest from the time Piechowski arrived on the scene until the time he departed, (PFOF, ¶ 2), although after arriving back at the Abrahams' house, Robert did tell another hunter "that they were going to be arrested, 'but they never actually were.'" (DFOF, ¶ 12).

Piechowski returned to Kepplinger's house and made out a report. He cleared the scene at 6:19 p.m. (DFOF, ¶ 13.) Taking all facts in plaintiffs' favor, their entire encounter with Piechowski thus lasted at most an hour and twenty minutes.

On June 24, 1997, Robert and his two sons filed this case against Piechowski and Piechowski's boss, Sheriff Patrick F. Fox, in both their individual and official capacities; the Waushara County Sheriff's Department; and Waushara County. Each plaintiff alleges against Piechowski a separate claim under 42 U.S.C. § 1983 and state-law claims of false imprisonment and intentional infliction of emotional distress (Counts I—IX). Each asserts a claim for supervisory liability of Fox under sections 1983 and 1986 for failure to train, instruct, or supervise Piechowski

---

duck hunt in the Pine River area is frequently interrupted by "protestors," who make noise to intentionally disrupt the hunt. Plaintiffs suggest that Kepplinger is one such protestor. (M. Abraham Dep. at 54; D. Abraham Dep. at 28; R. Abraham Dep. at 96.)

(Counts X—XII). And each plaintiff sues the county and sheriff's department under section 1983 for various policies that allowed the events to unfold as they did (Counts XIII—XV).

Currently before me is defendants' motion for summary judgment. In response to the motion plaintiffs conceded that they have no individual capacity claims against Piechowski and Fox and that the Waushara County Sheriff's Department is not a separate suable entity. That leaves two issues for decision: (1) does the Eleventh Amendment to the United States Constitution bar the claims against Piechowski and Fox in their official capacities?; and (2) do the facts support plaintiffs' federal claims against the county?

## II. SUMMARY JUDGMENT STANDARD

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that he or she is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmovant must designate specific facts to support or defend each element of the cause of action for which he or she bears the burden, showing that there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548.

The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Kendrick v. East Delavan Baptist Church,* 886 F.Supp. 1465, 1471 (E.D.Wis.1995).

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). " '[F]acts not outcome-determinative under the applicable law, though in dispute, may still permit the entry of summary judgment.' " *Id.* at 1292 (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)). And a failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Whether a material issue of fact is "genuine" necessarily requires some qualitative determination of sufficiency of the evidence. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). To defeat a properly supported motion for summary judgment, the opposing parties must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in their favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "A district judge faced with [a summary judgment motion] must decide ... whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is proper. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As the Supreme Court has stated and the Seventh Circuit recently reiterated, a district court resolves factual issues of controversy in favor of the nonmoving party

... only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the mov-

ant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint.... The object of [Rule 56(e)]˙ is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.

*Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Weeks v. Samsung Heavy Industries Co.,* 126 F.3d 926, 934 (7th Cir.1997). "Self-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994). Merely repeating under oath the same general allegations contained in the complaint is not enough to convert the suppositions into competent evidence sufficient to survive summary judgment. *See Wudtke v. Davel,* 128 F.3d 1057, 1061 (7th Cir.1997).

## III. SHERIFFS AND THE ELEVENTH AMENDMENT

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ...." U.S. Const. amend. XI. The Abrahams are Wisconsin citizens, but the amendment applies to them nonetheless. Under the Eleventh Amendment "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974).

Three exceptions to the constitutional bar exist:

First, suits against state officials seeking prospective equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment .... Second, individuals may sue a state directly if Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so and pursuant to a valid exercise of its power.... Finally, individuals may avail themselves of suits

against a state that has properly waived its sovereign immunity and consented to suit in federal court.

*Marie O. v. Edgar,* 131 F.3d 610, 614 (7th Cir.1997) (citations omitted). None of the exceptions exists in this case, however. Plaintiffs seek monetary, not injunctive, relief; Congress did not abrogate the Eleventh Amendment in regard to section 1983 claims, *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); and Wisconsin has not waived its immunity.

A lawsuit against a governmental officer in his or her official capacity is not a lawsuit against the official but rather is a lawsuit against the official's office. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Franklin v. Zaruba,* 150 F.3d 682, 683 n. 2 (7th Cir. 1998). The Eleventh Amendment therefore also bars lawsuits against state officials acting in their official capacities. *Id.* Therefore, if Fox and Piechowski are considered state actors they are completely immune from the plaintiffs' claims. The Eleventh Amendment, however, does not extend to counties and similar municipal corporations, *Franklin,* 150 F.3d 682, 683 n. 2, so if Fox and Piechowski represent the county, the claims continue on.

But do Fox and Piechowski represent the State of Wisconsin or Waushara County? The Supreme Court recently analyzed the same issue in regard to county sheriffs in Alabama, finding that they were policymakers for the state rather than the counties when acting in their law enforcement capacity. *McMillian v. Monroe County, Ala.,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). *McMillian* confirms that my inquiry is guided by two principles. First, rather than deciding the sheriff's role in an "all or nothing" manner, I must look at the specific area or issue involved. *Id.* at ——, 117 S.Ct. at 1737. In other words, for this case, because all of the claims stem from Piechowski's actions in regard to the Abrahams/Kepplinger dispute, I ask whether the sheriff represents the state or the county when acting specifically in his law enforcement capacity. Second, the inquiry is a matter of state law.

This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*Id.*

## A. History and Wisconsin Law

"American county government traces its family tree back nearly 1,000 years to the old English shire." Lawrence L. Martin, *American County Government: An Historical Perspective,* in *County Governments in an Era of Change* 1 (1993). Sheriffs in America trace their lineage back to the English "shire-reeve." Shire-reeves were the English monarch's officers or agents in the shires. *McMillian,* 520 U.S. at ——, 117 S.Ct. at 1741 (citing C. Wigan & D. Meston, *Mather on Sheriff and Execution Law* 1–2 (1935)). They served as "the steward[s] of the royal estates, the tax collector[s], and president[s] of the shire court[s] in all nonecclesiastical matters." Martin, *supra,* at 2. "Although chosen locally by the shire's inhabitants, the sheriff did 'all the king's business in the county,' ... and was 'the keeper of the king's peace.'" *McMillian,* 520 U.S. at ——, 117 S.Ct. at 1741 (quoting 1 W. Blackstone, *Commentaries on the Laws of England* 328, 332 (1765)).

> As the basic forms of English government were transplanted in our country, it also became the common understanding here that the sheriff, though limited in jurisdiction to his county and generally elected by county voters, was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace.

*Id.* (footnote omitted).

The Wisconsin constitution was adopted in 1848. Article VI, section 4 of the constitution provides for the election of county officers, including sheriffs, registers of deeds, and district attorneys. The provision itself does not characterize sheriffs as either state or county officials, but it does state that they may be required to provide security for their positions and that the governor has the power to remove them from office. Article VI as a whole concerns administration of the state; its other sections control elections for the offices of secretary of state, state treasurer, and attorney general.

In *Wisconsin Professional Police Association v. County of Dane,* 106 Wis.2d 303, 316 N.W.2d 656 (1982), the Supreme Court of Wisconsin found that when the Wisconsin constitution was adopted, article VI, section 4 incorporated the role of sheriff as having all "the power and prerogatives which that office had under the common law." *Professional Police,* 106 Wis.2d at 305, 316 N.W.2d 656. The court described that common law authority as follows: "In the exercise of executive and administrative functions, in conserving the public peace, in vindicating the law, and in preserving the rights of the government, he (the sheriff) represents the sovereignty of the State and *he has no superior in his county.*" *Id.* at 309, 316 N.W.2d 656 (quoting Walter H. Anderson, *A Treatise on the Law of Sheriffs, Coroners and Constables* § 6 (1940)) (emphasis added by Wisconsin court).[3]

But although history and the language of *Professional Police* do suggest that there is a "state" component to the sheriff position, whether sheriffs are indeed state rather than county officers has never been directly decided by the Wisconsin Supreme Court. The Seventh Circuit, however, has made a pronouncement.

## B. The *Soderbeck* Cases

In *Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285 (7th Cir.1985) (*Soderbeck I* ), the plaintiff believed she was fired from

---

3. *Professional Police* invoiced whether a county could restrict the sheriff's selection of a "court officer" through a collective bargaining agreement entered into between the county and the union representing nonsupervisory deputies on the sheriff's staff. The Wisconsin high court found that "attendance on the court" was one of the sheriff's inherent powers at common law, remanding the case for resolution of whether the functions of the "court officer" position infringed on the sheriff's inherent "attendance on the court" power.

her job in the sheriff's office in violation of her First Amendment rights. She sued the sheriff, the county, and the county's Law Enforcement Committee under section 1983. She asserted that the sheriff as well as members of the committee participated in making the decision to terminate her. A jury found in Soderbeck's favor as against the sheriff and the county, but the trial court directed a verdict against her in regard to the committee members.

Soderbeck wanted the county to be liable as well as the sheriff. At the time of Soderbeck's firing, however, Article VI, section 4 of the Wisconsin constitution stated that "the county shall never be made responsible for the acts of the sheriff." Then–Circuit Judge Posner noted that this

> immunity provision is powerful evidence that the Sheriff of Burnett County was not a policy-making official of the county at the time he fired Mrs. Soderbeck, but instead was an autonomous official .... But we need not pursue this issue, as the plaintiff made no effort to show that the sheriff is a policy-making official of the county government. The basis on which she tried to implicate the county in the sheriff's wrongdoing was different; it was the involvement of the members of the county's Law Enforcement Committee [in the decision to fire her].

*Id.* at 292. The jury's verdict against the county had to be reversed because as argued by Soderbeck the county's liability was derivative only from that of its policymaking committee members. The case was remanded for trial against the committee members and county.

At the second trial the jury returned a verdict in favor of the committee members and county. Soderbeck appealed, arguing that the county nevertheless was liable to her based on the sheriff's actions. A different panel of the Seventh Circuit heard the second appeal, *Soderbeck v. Burnett County, Wis.*, 821 F.2d 446 (7th Cir.1987) (*Soderbeck II*), and treated Judge Posner's dicta about the role of the sheriff as an established legal principle. According to *Soderbeck II*, *Soderbeck I* expressly held that "since under Wisconsin law the sheriff is not a policymaking official of the county, Burnett County was

not liable for the acts of Sheriff Kellberg." *Soderbeck II*, 821 F.2d at 449. *Soderbeck I* did not go this far—as Judge Posner's "[b]ut we need not pursue this issue" language made clear.

The *Soderbeck II* panel also felt constrained by the language from *Professional Police* that the sheriff " 'represents the sovereignty of the State.' " *Soderbeck II*, 821 F.2d at 451 (quoting *Professional Police*, 106 Wis.2d at 309, 316 N.W.2d 656). The panel questioned the correctness of classifying a county sheriff as an officer of the state rather than the county, but stated that the Wisconsin Supreme Court's:

> determination based as it is on an interpretation of the Wisconsin Constitution is not subject to revision by this court.... Accordingly, we are bound to accept the Wisconsin Supreme Court's classification of the county sheriff under the State's constitution as being solely an officer of the state when fulfilling his constitutional obligations even though it appears to us that the office of sheriff is really more of a hybrid official of both the state and the county.

*Soderbeck II*, 821 F.2d at 451. It is to this language in *Soderbeck II* that defendants point, arguing that treating a Wisconsin sheriff as a state official is an open and shut case.

For several reasons, I do not believe that *Soderbeck II*'s characterization of Wisconsin sheriffs as arms of the state binds my decision today. First, as stated above, it places more weight on certain language in *Soderbeck I* than is warranted. Second, the entire discussion of the issue in *Soderbeck II* is dicta. At the end of its discussion, the *Soderbeck II* court recognized that the whole matter was outside the scope of the case as remanded by the *Soderbeck I* panel:

> Since we expressly remanded this case for a consideration of whether the Burnett County Law Enforcement Committee was liable to Soderbeck the district court did not err in refusing to allow Soderbeck to introduce evidence of Sheriff Kellberg's status as a county policy-maker and in refusing to grant Soderbeck's motion for summary judgment. If the district court had allowed Soderbeck to introduce evidence of Kellberg's status as a county policy-maker, the trial court's decision would

have violated the doctrine of the law of the case since it would have allowed the court to consider a matter that had already been decided by this court.

*Soderbeck II,* 821 F.2d at 452. In other words, the *Soderbeck I* court found that the plaintiff chose to argue county liability based upon the acts of the Law Enforcement Committee rather than the sheriff, waiving the latter theory. On remand, evidence regarding the sheriff's status vis a vis the county thus was beyond the scope of the issues to be tried.

Third and most importantly, and as further discussed below, the constitutional immunity provision at the heart of all of this dicta in both *Soderbeck* cases has been repealed, and the *Professional Police* language relied upon by *Soderbeck II* thus no longer is persuasive authority.[4]

My rejection of *Soderbeck II* as controlling on the issue of whether sheriffs are state or county officers means that I also find *Koser v. County of Price,* 834 F.Supp. 305 (W.D.Wis.1993), unpersuasive. The *Koser* court held that a Wisconsin county sheriff was not a county policymaker but rather a representative of the sovereign state, but it relied solely upon *Soderbeck II* for that holding. *Id.* at 311.

### C. Wisconsin Constitutional and Statutory Changes Make Clear That Under Wisconsin Law Sheriffs are Arms of the Counties

An amendment to article VI, section 4 has changed things drastically since the *Pro-*

*fessional Police* decision issued. Until 1982 the section included the provision noted by Judge Posner—that "the county shall never be made responsible for the acts of the sheriff." The language was to prevent the county "from being a surety, that is, to spare the county treasury from liability to third parties damaged by the acts of the sheriff, since the sheriff was to be an independent elective officer." *Bablitch & Bablitch v. Lincoln County,* 82 Wis.2d 574, 579, 263 N.W.2d 218 (1978). In 1982, though, the phrase was repealed. 1979 Wis. Enrolled Joint Res. 38; 1981 Wis. Enrolled Joint Res. 15; vote April 1982.[5] The ballot question posed to the voters read:

> *County responsibility for acts of sheriff.* Shall section 4 of article VI of the constitution be amended to provide that the legislature may, by law, permit or require counties to be responsible for the acts of the sheriff?

1981 Wis. Enrolled Joint Res. 15; Legislative Reference Bureau, 82–2 *Wisconsin Briefs* 2 (March 1983). By responding "yes" the electorate implicitly approved the characterization of sheriffs as county officials.

Subsequent to the repeal of the bar to county liability, the Wisconsin legislature passed 1983 Wisconsin Act 6. Wisconsin Statute § 895.46(1)(a) then read—and still reads—in pertinent part:

> If the defendant in any action or special proceeding is a public officer or employe

---

4. *Soderbeck II* also relied on *Andreski v. Industrial Comm'n,* 261 Wis. 234, 52 N.W.2d 135 (1952), a case in which the Supreme Court of Wisconsin was asked to determine for purposes of worker's compensation, whether a sheriff was on or off duty when he died. In discussing the sheriff's duties, the Wisconsin court did note that the sheriff "is accountable only to the sovereign" and that "[n]o other county official supervises his work." *Id.* at 240, 52 N.W.2d 135. But besides being dicta, the *Andreski* language supports a characterization of sheriffs as county officials as much as state officials, because the sovereign is specifically described to be the "voters of his county", in contrast to the governor or the state entity itself. *Id.* ("the sheriff ... is accountable only to the sovereign, the voters of his county, though he may be removed by the governor for cause"). *Soderbeck II* also failed to address the Wisconsin Supreme Court's holding in *Bablitch*

*& Bablitch v. Lincoln County,* 82 Wis.2d 574, 579, 263 N.W.2d 218 (1978), that Article VI, section 4 even as previously worded did *not* bar the county from providing defense counsel or reimbursing a sheriff for expenses incident to defending lawsuits bought against him while acting in his official capacity. If the state considered sheriffs to be state officials, sheriffs would generally be represented by the attorney general rather than, as in this case and as is typical, by county counsel.

5. Amending the Wisconsin Constitution requires the adoption of a proposed amendment by two successive sessions of the state legislature and ratification of the amendment by the voters. Wis. Const. art. XII, § 1; Legislative Reference Bureau, 82–2 *Wisconsin Briefs* 1 (March 1982).

and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employe and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employe .... shall be paid by the state or political subdivision of which the defendant is an officer or employe.

Act 6 added that persons holding the office of county sheriff or job of deputy sheriff "are covered by this subsection." Wis. Stat. § 895.46(1)(b), (d).[6] Although the text of the subsection does not say specifically whether it is "the state" or "[the] political subdivision", i.e. the county, that is liable for the acts of the sheriff, the official comments and legislative history regarding 1983 Wisconsin Act 6 make clear that the sheriff is a *county* official for purposes of any lawsuit against him or her in an official capacity because of acts committed while carrying out official duties:

Section 895.46(1)(a) of the statutes has never been construed to require counties to pay civil judgments and court costs on behalf of county sheriffs because the Wisconsin constitution, in article VI, section 4(3), provided that " ... the county shall never be made responsible for the acts of the sheriff." ... However, at the April 6, 1982, spring election, the voters repealed this constitutional provision, thereby permitting the legislature to require by law that counties pay civil judgments against sheriffs.

Section 3 of this bill requires *counties* to pay civil judgments and taxable costs on behalf of all incumbent county sheriffs pursuant to the mandatary payment provisions of present § 895.46(1)(a), stats. Other sheriffs will also be covered if they have [certain law enforcement training or five years prior employment as a law enforcement officer].

\* \* \* \* \* \*

Section 4 of this bill provides that all deputy sheriffs ... are covered by the mandatory payment provisions of s. 895.46(1)(a), stats.

Wis. Stat. § 895.46 cmt. 1983 Act 6 (emphasis added); 1983 Wis. Act 6 explanatory notes (emphasis added).

Moreover, even before the enactment of these constitutional and statutory changes, the Supreme Court of Wisconsin recognized that the common law understanding of a sheriff was not carved in stone. According to that court,

[i]t should not be held, in our judgment, that the constitution prohibits any legislative change in the powers, duties, functions, and liabilities of a sheriff as they existed at common law. If that were true, a constitutional amendment would be necessary in order to change the duties of sheriffs in the slightest degree and, in this respect, "the state would be stretched on a bed of Procrustes.[ 7]"

*State ex rel. Milwaukee County v. Buech,* 171 Wis. 474, 481–82, 177 N.W. 781 (1920), *quoted in Professional Police,* 106 Wis.2d at 311–12, 316 N.W.2d 656. Thus, not only did the legislature make a change in the characterization of the sheriff, but the voters of Wisconsin did as well. Together, the repeal of the liability limitation in Article VI, section 4 and the enactment of 1983 Wisconsin Act 6 indicate Wisconsin's decision—by its citizens and legislators—that even if sheriffs at common law may have been otherwise, today they are county actors.

Additional statutory provisions support the characterization of the sheriff as a county officer. The Wisconsin legislature has established a state department of justice, which

---

**6.** Although section 895.46 did not previously exclude sheriffs, the Supreme Court of Wisconsin had found that they were indeed excluded by virtue of Article VI, section 4. *Larson v. Lester,* 259 Wis. 440, 446, 49 N.W.2d 414 (1951).

**7.** Procrustes was a "legendary robber of ancient Greece who forced his victims to fit a certain bed by stretching or lopping off their legs." *Web-* ster's Third New Int'l Dictionary at 1809 (1986) (definition of "procrustean"). "Procrustean" now means exhibiting a ruthless disregard for individual differences or special circumstances, and a "procrustean bed" means an arbitrary standard to which precise conformity is forced. *Id.*

"[i]nvestigate[s] crime which is statewide in nature, importance or influence." Wis. Stat. § 165.70(1)(a). State-wide crime prevention, therefore, is entrusted to the state attorney general, who may appoint as many investigators as he or she deems necessary and may devise programs to control drugs and narcotics abuse, commercial gambling, prostitution, and arson. Wis. Stat. § 165.70(2), (3). All of this makes the county sheriff's focus even more inward on the county itself. Wisconsin Statute § 59.21 requires sheriffs, like the county clerk, treasurer, and register of deeds, to post an official bond and take an oath. The county board sets the annual salary of the sheriff and may provide for reimbursement of the sheriff's out-of-pocket expenses from county funds. Wis. Stat. § 59.22(1)(a), (3). And the county board may appropriate money to the family of any sheriff or deputy sheriff killed while discharging official duties. Wis. Stat. § 59.52(20). Sheriffs thus are treated like other county officers regarding bonds and depend on the county to determine their compensation, while counties accept responsibility when an officer is killed on duty, again leading to an inference that sheriffs are better characterized as county officials.

Moreover, *McMillian* recognized that the importance of counties and the nature of county government may vary from state to state, which can impact a court's characterization of the sheriff. *See McMillian*, 520 U.S. at ——, 117 S.Ct. at 1741–42. The Supreme Court noted that Alabama ranks 37th among the states in the amount of discretionary authority granted to its counties. *Id.* at ——, 117 S.Ct. at 1742. The same study cited by the *McMillian* court, however, ranks Wisconsin 15th among the states in the amount of discretionary authority given to counties. Victor S. DeSantis & Tari Renner, *Governing the County*, in *County Governments in an Era of Change* 19 (1993).[8] Holding the sheriff to be a county officer thus is in line with the autonomy given to counties as a whole in this state.

And finally, adjudging the sheriff to be a county officer comports with decisions regarding sheriffs in states with similar constitutional provisions and county structures. Wisconsin's county structure stems from that developed in the original colonies of New York and New Jersey. Martin, *supra*, at 5. Article VI, section 4, in fact, was adopted from the New York constitution. *Bablitch*, 82 Wis.2d at 577, 263 N.W.2d 218. The New York/New Jersey structure spread to Ohio, Michigan, and Illinois as well. Martin, *supra*, at 5. In each of these other midwest states, county sheriffs acting in their law enforcement capacity have been held to be county officers. *Franklin*, 150 F.3d 682, (while training deputies and supervising their apprehension of citizens, Illinois sheriffs act on behalf of county rather than state for Eleventh Amendment purposes, even in face of Illinois Supreme Court holding that counties are not liable under *respondeat superior* theory for sheriff's actions); *Scott v. O'Grady*, 975 F.2d 366, 370–71 (7th Cir.1992) (under Illinois provision similar to Wisconsin Article VI, section 4 providing for election of county officers, Illinois law classifies sheriffs as county officials); *Marchese v. Lucas*, 758 F.2d 181, 188–89 (6th Cir.1985) (under constitutional provision somewhat similar to Article VI, section 4, Michigan sheriff acts for county in training deputies and ratifying their use of force); *see Pembaur v. City of Cincinnati*, 746 F.2d 337, 341 (6th Cir.1984), *rev'd on other grounds*, 475 U.S. 469, 476, 484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (Ohio sheriffs are county officials); *see also Weber v. Dell*, 804 F.2d 796, 802–03 (2d Cir.1986) (New York sheriff acts for county in setting county jail strip search policy even in face of provision saying county not responsible for acts of sheriff).

In sum, Fox and Piechowski represent the county when acting in their law enforcement capacity and the Eleventh Amendment does not apply.

## IV. CIVIL RIGHTS CLAIMS AGAINST THE COUNTY

Because Piechowski and Fox are sued in their official capacities and represent the

---

8. The *McMillian* decision provides an incorrect cite (page 37) for this list and attributes it to a different essay in the same book. It is clear, however, that the Court used the table from DeSantis and Renner on page 19, as Alabama indeed is ranked 37th on it, and page 37 has no such list and does not mention Alabama at all.

county, all claims in this case thus boil down to claims against Waushara County, which raises a serious problem for plaintiffs.

## A. The Section 1983 Claims

Title 42 U.S.C. § 1983 states that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiffs assert that their infringed constitutional rights are their right to be free from unreasonable seizures and the right to be free from a threat of excessive, unreasonable and unjustified force against them, in violation of the Fourth and Fourteenth Amendments. (Compl., ¶ 21.) For purposes of this discussion, I will assume (with some skepticism) that a constitutional violation occurred. But section 1983 requires plaintiffs to prove that the deprivation of federal rights was due to or caused by the conduct of a "person" acting under color of state law. 42 U.S.C. § 1983.

Although counties are "persons" for purposes of section 1983, liability against counties nevertheless may not arise vicariously; counties cannot be held liable under section 1983 on a *respondeat superior* basis. *Monell v. Department of Social Services,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, counties are liable only for acts for which the entity itself is responsible, meaning acts the entity has embraced as policy or custom. *Id.* at 690–91, 694, 98 S.Ct. 2018. To show such responsibility, plaintiffs must prove (1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amounting to an unconstitutional practice so permanent, well-settled, and known to Waushara County as to constitute a "custom or usage" with force of law; or (3)

the conduct was caused by a decision of a municipal policymaker with final policymaking authority in the area in question. *McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995); *see Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018.

Plaintiffs complain of two alleged policies or customs of the Waushara County Sheriff's Department, which are attributable to the County: (1) "inadequately and improperly investigat[ing] citizen complaints of officer misconduct," and instead tolerating such misconduct; and (2) "inadequately supervis[ing] and train[ing] its officers, including Piechowski and Fox, thereby failing to adequately discourage further constitutional violations on the part of its officers." (Compl., ¶¶ 53–56, 58–60, 62–64.) Furthermore, according to plaintiffs, Fox, as a policymaker, himself failed to train, instruct, supervise and discipline Piechowski and failed to take preventative or remedial measures to guard against Piechowski's misconduct. (Compl., ¶¶ 45, 48, 51.)

In *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the United States Supreme Court directly addressed the requirements for bringing a section 1983 claim based upon allegations of a municipality's failure to train its law enforcement officers. Geraldine Harris was arrested by the Canton police. During the time she was in custody she slumped on the floor several times, but the police never summoned medical attention for her. Only after her release from custody was she taken by ambulance (provided by her family) to a hospital. Harris sued the city, arguing that it failed to provide special training to the officers who had discretion to determine if medical attention was needed.

The Court held that inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *Id.* at 388, 109 S.Ct. 1197. Moreover, a plaintiff cannot merely allege that an existing training program for a class of employees, such as deputy sheriffs, represents a policy for which the county is respon-

sible. *Id.* at 389, 109 S.Ct. 1197. The issue is whether that training program is adequate; and, if it is not, whether such inadequate training can justifiably be said to represent "city policy." *Id.* at 390, 109 S.Ct. 1197. A plaintiff must demonstrate that, through the county's "deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

■ "City policy" may arise "if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390, 109 S.Ct. 1197. For example, the Court noted, municipal "policymakers know to a moral certainty" that their police officers will be required to arrest fleeing felons, and they have armed their officers with firearms in part to allow them to accomplish this task. Thus, the need to train officers in the use of deadly force can be thought so obvious that failure to train them properly may be deliberate indifference to constitutional rights. *Id.* at 390 n. 10, 109 S.Ct. 1197. Or it may happen that the police, in exercising their discretion, so often violate constitutional rights that the need for further training is plainly obvious to city or county policymakers, but they nevertheless are deliberately indifferent to the need. *Id.* This theory of course requires proof of a pattern of unconstitutional behavior by defendants or other employees of the municipality prior to the alleged violation.

■ Because Piechowski is not a county policymaker, proving the county's training or investigative policies were inadequate thus requires more evidence than just that of the underlying violation itself. According to the Court,

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.... It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390–91, 109 S.Ct. 1197.

These requirements of deliberate indifference and proof of an actual policy apply not only to plaintiffs' claims that Fox and the county failed to train their law enforcement staff, but also to plaintiffs' claim that the county inadequately and improperly investigated citizen complaints about officer misconduct, as again a pattern of failing to do something, rather than an express or official county policy, is involved.

■ In response to defendants' motion for summary judgment, plaintiffs were required to support their claims of failure to investigate and train with evidence. They did not. Their entire evidentiary response on this matter in their proposed findings of fact is as follows:

> In employment matters, the Waushara County Sheriff's Department and Waushara County have both promulgated rules, procedures and policies relating to the conduct and discipline of employees, including those in the Department, which are applied by the Waushara County Law Enforcement Committee upon petition by the sheriff.

PFOF, ¶ 6. Their brief supports its one-paragraph discussion of Fox's supervisory policies or customs by saying merely that "[a]t his deposition, Robert testified that the following individuals had knowledge of how Fox supervised his employees and/or operated his department ...." One short footnote addresses supposed county policy, merely indicating

that the same individuals also would have information regarding that matter. Pl. Brf. at 12–13. Plaintiffs do not indicate what any of the individuals would state, much less whether any such individuals would even implicate county policy or custom as being inadequate. No affidavits were submitted from any individuals with such purported knowledge.

Defendants did not really raise this issue until their reply brief, so plaintiffs' failure to support with evidence their claims of inadequate training might have been excused. Noting this problem with the case, however, I gave plaintiffs the opportunity to file a surreply brief, specifically directing them to address the matter of county policy. Plaintiffs responded with further argument and some evidence that the county has some general policies about overseeing officer training, but presented absolutely nothing regarding specific inadequacies in the training programs.

Taking the scant evidence even the best light for plaintiffs, at most they have established that the department and county have some rules, procedures, and policies regarding training, conduct and discipline. What these actually are is unspecified—for all I know they could be about how deputies are to appear in court, how they are to file reports, or how they are to process evidence, and the ramifications of failing to do these things. And just how Fox's and the department's training and investigative practices are insufficient, or what makes them inadequate in regard to the facts of this case, the Abrahams do not say. Plaintiffs offer no evidence to indicate Waushara County failed to adhere to the training standards for law enforcement officers as mandated by Wisconsin law. See Wis. Stat. § 165.85. Nor do they provide any expert testimony regarding better policy training practices and what rules *should* govern situations where deputy sheriffs approach armed hunters or when deputies detain citizens during an investigation. They have presented no testimony or evidence that there were similar past incidents of improper lengths of custody or detention that would put the county on notice of the need for more training. Compare this case with *City of Oklahoma City v. Tuttle*, 471

U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), where plaintiff offered testimony from expert in police training practices, *id.* at 812, 105 S.Ct. 2427, and regarding whether rookie police officers could patrol alone, what rules should govern use of backup units, and how much time is spent in training on use of firearms, *id.* at 829 n. 4, 105 S.Ct. 2427 (Brennan, J., concurring in part and in the judgment).

Under *Canton*, plaintiffs' profferings regarding county "policies" of failing to train or investigate complaints are plainly insufficient, such that no reasonable jury could find in plaintiffs' favor on this issue. In this case, the need for more or different training is not obvious nor has any pattern even been alleged such that county policymakers can be said to have been deliberately indifferent. Under *Canton*, which plaintiffs even cite in their surreply, they cannot merely allege that training constitutes a county policy. The issue is whether the training program is adequate, and, if not, whether the inadequacies can be attributed to the county. *See Canton*, 489 U.S. at 389–90, 109 S.Ct. 1197. Indicating that some witnesses may have some information that might be relevant on the matter is not sufficient in response to a motion for summary judgment. The time for establishing actual evidence has passed and plaintiffs have come forward with nothing that would support a jury verdict in their favor regarding the existence of a county policy, let alone one that is inadequate.

■ Moreover, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391, 109 S.Ct. 1197; *see Tuttle*, 471 U.S. at 823, 105 S.Ct. 2427 (plurality opinion) ("[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged"). Plaintiffs must prove that the (as yet unspecified) deficiency in training *actually caused* the constitutional violation. *Canton*, 489 U.S. at 391, 109 S.Ct. 1197. In other words, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified re-

spect?" *Id.* The court must be careful to hold plaintiff to a "very close causal connection," *id.* at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part), because in almost every case a plaintiff will be able to point to something a municipality "could have done" to prevent the unfortunate incident, *id.* at 392, 109 S.Ct. 1197. Again, no evidence has been presented to establish that the county actually "cause[d] [plaintiffs] to be subjected" to unconstitutional behavior as required by section 1983 (assuming for argument's sake, of course, that Piechowski's response to the situation was improper).

All that plaintiffs have is a single, isolated instance of alleged misconduct by a low-level officer. But where the policy itself· is not unconstitutional and no policymaker is specifically involved, "considerably* more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Tuttle,* 471 U.S. at 824, 105 S.Ct. 2427 (plurality opinion) (footnotes omitted). To infer the existence of a county policy from this single incident and hold the county liable on the basis of that policy would amount to the type of *respondeat superior* liability precluded by *Monell. See Canton,* 489 U.S. at 399–400, 109 S.Ct. 1197.

Summary judgment must be granted to defendants on their section 1983 claims.

## B. Section 1986 Claims

■ Plaintiffs' complaint also incorporates claims against Fox under 42 U.S.C. § 1986, which reads:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . .

Both 42 U.S.C. §§ 1983 and 1986 derive from the Civil Rights Act of 1871. *See Monell,* 436 U.S. at 665–69, 98 S.Ct. 2018. The Second Circuit and Judge John W. Reynolds

of this district have held that the *Monell* standards also apply to section 1985 and 1986 actions. *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.1979); *Bell v. City of Milwaukee,* 536 F.Supp. 462, 472–473 (E.D.Wis.1982), *vacated and rev'd on other grounds,* 746 F.2d 1205 (7th Cir.1984); *see also Luke v. Abbott,* 954 F.Supp. 202 (C.D.Cal.1997) (holding same); *Vasquez v. City of Reno,* 461 F.Supp. 1098 (D.C. Nev. 1978) (holding same). Plaintiffs give me no reason to decide otherwise.

■ Moreover, section 1986 by its terms is predicated upon the existence of a violation of section 1985, the only pertinent portion of which requires a conspiracy by two or more persons to deprive another of the equal protection of the laws. Plaintiffs' complaint fails to allege, and their evidence completely fails to support, any conspiracy at all, and plaintiffs do not even suggest that they belong to a protected class and were denied any rights on that basis. *See Majeske v. Fraternal Order of Police, Local Lodge No. 7,* 94 F.3d 307 (7th Cir.1996) (plaintiff raising claim under section 1985(3) must allege (1) existence of conspiracy, (2) purpose of depriving person or class of persons of equal protection of the laws, (3) act in furtherance of alleged conspiracy, and (4) injury to person or property or deprivation of federal right). Their section 1986 claims, therefore, fail as well and summary judgment is appropriate.

## V. CONCLUSION

For the reasons set forth above, summary judgment will be granted as to all federal claims in this case.

In regard to the pendent state claims, generally "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir.1994). In this case I see no reason to depart from the general rule. As a result, the state law claims will be dismissed without prejudice.

**NOW, THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED** as to all federal claims.

FURTHER, IT IS ORDERED that plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE.**