Mark A. GROW, Therese Barwinski–Gipp, Jean Docter and Ronald L. Lindsey, Plaintiffs,

v.

CITY OF MILWAUKEE and City of Milwaukee Police Department, Defendants.

No. 97–C–0572.

United States District Court, E.D. Wisconsin.

Feb. 25, 2000.

Wm. Rettko, Milwaukee, WI, for plaintiffs.

Jan Smokowicz, for defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiffs Mark A. Grow, Therese Barwinski–Gipp, Jean Docter, and Ronald L. Lindsey are Milwaukee police officers. They bring this action under 42 U.S.C. § 1983 alleging that the defendants, the City of Milwaukee and its police department, subjected them to unreasonable searches and seizures in violation of their rights under the Fourth and Fourteenth Amendments. Both parties have moved for summary judgment. The principal issues presented by the summary judgment motions are whether the plaintiffs were searched and seized and, if so, whether the seizures were reasonable. Plaintiff Grow also alleges that the entry into and search of his home violated the Fourth Amendment and § 1983. Defendants contend that even if the plaintiffs' constitutional rights were violated the City of Milwaukee may not be held liable because the violations did not arise from a municipal policy or custom. On its own motion the court raises the question of whether the police department is a suable entity separate from the City of Milwaukee. In this decision I address the summary judgment motions, as well as a motion to preclude defense witnesses submitted by plaintiffs and a motion in limine submitted by defendants.

## I. FACTUAL BACKGROUND

### A. Relevant Police Department Rules

Three Milwaukee Police Department rules are relevant to the issues in this case. One such rule, MPD Rule 4 § 2/025.00 (the "subject to duty rule"), provides:

> Members of the police force shall have regular hours assigned to them for active duty each day, and when not so employed they shall be considered "off duty." Normal hours of work shall consist of work shifts of eight (8) consecutive hours which in the aggregate results in an average work week of forty (40) hours. The regularly scheduled eight hour shift shall be established by the Chief of Police in accordance with the foregoing. Members of the police force shall, however, be always subject to duty although periodically relieved from the routine performance of it. They are always subject to orders from proper authority and to call from civilians. The fact that they may be technically "off duty" shall not be held as relieving them from the responsibility of taking required police action in any matter coming to their attention at any time.

(Pls.' Resp. & Objs. to Def.'s Stmt. of Facts ¶ 1.)

A second relevant rule, MPD Rule 4 § 2/095.00 (the "intoxication rule"), states:

> Whenever members of the Department are found intoxicated, whether on or off active duty, they shall be immediately suspended, and a charge of "intoxicated" shall be preferred against them. The word "intoxicated" as used in this section, shall mean any abnormal state or condition resulting from the use of intoxicating liquor and/or fermented malt beverages which renders such member unfit to properly perform police duties.

(Pls.' Findings of Facts ¶ 5, hereafter "Pls.' FOF.") [1]

1. The current intoxication rule was enacted in 1996. It replaced earlier, virtually identical rules. (*See* Pls.' FOF ¶¶ 1 & 2.)

The third relevant rule (the "testing rule") provides:

All Department members ... are to take notice and be cognizant of the fact that current Department policy requires a member to submit to an alcohol test whenever two or more supervisors observing the member have a reasonable suspicion to believe that the member is in violation of ... Rule 2/095.00 (Intoxicated On or Off Duty.)

Positive test results shall constitute grounds for discipline, which may result in discharge. A member's refusal to submit to an alcohol test when ordered to do so by a supervisor shall constitute grounds for discipline, which may include discharge.

The term "alcohol test" as herein means breathalyzer/ intoxilyzer/ blood test/urinalysis testing procedures established by the Department.... [2]

(Pls.' FOF ¶ 6.)

The foregoing rules were reviewed and approved by the Milwaukee Board of Fire and Police Commissioners. (Pls.' FOF ¶ 7.) Taken together, these rules provide that a Milwaukee police officer is always subject to duty, may not be intoxicated on or off duty and must submit to an alcohol test, whether on or off duty, whenever two supervisors reasonably suspect the officer to be intoxicated.

## B. Facts Underlying Plaintiffs' Claims

The facts underlying each plaintiff's claim are as follows: plaintiff Lindsey was off duty and at home on the morning of July 8, 1991, when he got into an argument with his wife. In the course of the quarrel Lindsey tipped over an ironing board and punched a cabinet. He was not alleged, however, to have committed any act of abuse. (Smokowicz Aff. of 6/1/99, Attach. A at 16.) After the quarrel Lindsey went to bed. (Id.) At some point Lindsey's wife called the police. (Id. at 20.) At 8:30 a.m.

two police officers were dispatched to the Lindsey residence and were admitted by Mrs. Lindsey. Shortly thereafter, two police supervisors arrived and were admitted by Mrs. Lindsey. (Id.)

The supervisors went into the bedroom where Lindsey was sleeping and awoke him. They noted a strong odor of alcohol on his breath. (Id.) They ordered him to get out of bed and accompany them to a police station for an alcohol test. (Id. at 24.) The supervisors refused his request to wash up, brush his teeth and comb his hair. (Id. at 25.) They then took him to a police station where he was ordered to take an intoxilyzer test. The test resulted in a reading of 0.18 grams of alcohol in 210 liters of breath. Subsequently, the police chief suspended him for five days without pay for violating the intoxication rule.

On August 23, 1996, plaintiff Jean Docter, while off duty, attended the Serbian Day festival in Milwaukee. At the festival a fight broke out. Docter attempted to stop the fight and was struck in the head. (Pls.' FOF ¶¶ 63 & 64.) She then called 911, and several on-duty police officers were dispatched to the festival. (Id. ¶ 65.) She approached one of the officers, a sergeant, to make a battery complaint against the person who struck her. The sergeant suspected that she was intoxicated and contacted the department. The sergeant then ordered Docter to stand nearby, permitted her to use the restroom only with an escort, and refused her request to leave. Subsequently a second supervisor arrived. The supervisors ordered Docter to accompany them to the police station for an alcohol test. At the station they ordered Docter to take an intoxilyzer test which resulted in a reading of 0.17 grams of alcohol per 210 liters of breath. Subsequently, the police chief suspended Docter for five days without pay in part for violating the intoxication rule.

---

**2.** Like the intoxication rule the testing rule is almost identical to earlier versions of the rule. Of the four plaintiffs in the present case only Lindsey was subject to an earlier version of the current rule. Because of the similarity between the present rule and its predecessors, it is sufficient for purposes of this decision to discuss only the current rule.

On December 18, 1996, plaintiff Therese Barwinski–Gipp was on injury leave. At about 8:45 p.m., a sergeant began calling her to determine whether she was complying with the department rule that officers on injury leave are, under certain circumstances, not permitted to leave home without receiving permission.[3] Barwinski–Gipp did not answer these calls. Two supervisors went to her home and found no one there. The supervisors saw her car in the parking lot of a nearby restaurant. At 11:30 p.m. they entered the restaurant and observed Barwinski–Gipp in the bar with what they thought was an alcoholic beverage. (Id.¶ 39.) They asked if she had been drinking to which she responded sarcastically that she was "drinking a lot." (*Id.* ¶ 41.) The supervisors ordered Barwinski–Gipp to accompany them to a police station to take an alcohol test. At one point they escorted her back into the restaurant to get her jacket. (Smokowicz Aff. of 6/1/99, Attach. C Vol. I at 76.) They placed her in their squad car and transported her to the police station. At the station, Barwinski–Gipp was ordered to submit to an intoxilyzer test the result of which was .00 grams of alcohol per 210 liters of breath.

On January 12, 1997, plaintiff Mark A. Grow came home from work and got into an argument with his wife. At some point Grow broke a wine glass and threw it on the ground. Grow was not alleged, however, to have committed any act of abuse. (*Id.* Attach. D at 37.) During the argument Grow's wife talked on the telephone to her mother. Grow's mother-in-law called the police. The department dispatched two supervisors to Grow's home. Prior to the supervisors' arrival Grow's wife left the home. When the supervisors arrived they found the outer front door closed, but the inner front door open. They knocked and received no response. The police then instigated a "knock and talk" technique calling out, "Police, anyone here?", and got no response. (Williams Aff. of 5/20/99 ¶¶ 3–6.)

The supervisors entered Grow's home. Grow was alone in the home. He told the supervisors to leave. The supervisors refused to leave and concluded that Grow was intoxicated. They then ordered Grow to accompany them to the police station for an alcohol test. However, before leaving, they searched his house. They retrieved an unloaded shotgun from the second floor and took Grow's badge and service revolver. The supervisors transported Grow to a police station and administered an intoxilyzer test, the result of which was 0.11 grams of alcohol per 210 liters of breath. Subsequently, the police chief suspended Grow for one working day for violating the intoxication rule.

With respect to all of the plaintiffs the parties agree as follows: at no time during any of the incidents did the police supervisors have probable cause to believe that any of the plaintiffs had committed or was about to commit a crime, (Defs.' Resp. to Pls.' First Req. for Admis. ¶¶ 12, 64, 148, 198); none of the plaintiffs were arrested; none of the plaintiffs were armed; the only reason that the supervisors ordered the plaintiffs to accompany them to police stations was because they suspected the plaintiffs were intoxicated; and all intoxilyzer machines owned by the police department are located at department facilities and none are mobile.

## II. POLICE DEPARTMENT AS DEFENDANT

■ Plaintiffs named both the City of Milwaukee and the City of Milwaukee Police Department as defendants. Federal Rule of Civil Procedure Rule 21 authorizes the court to drop parties "on motion of any party or of its own initiative." Federal Rule of Civil Procedure Rule 17(b) provides that the capacity of an entity "to sue or be sued" is determined by state law. Wis.Stat. § 62.50 governs police depart-

---

**3.** Barwinski–Gipp disagrees with defendants that she was required to be at home, but, for purposes of these motions, the issue is irrelevant.

ments in cities of the first class, a category which includes the City of Milwaukee. Section 62.50 does not authorize police departments to sue or be sued. Further, by definition, the police department is an agency of the City of Milwaukee. As such, it is not a suable entity separate from the city. *See Buchanan v. City of Kenosha,* 57 F.Supp.2d 675, 678–79 (E.D.Wis.1999) (Kenosha County District Attorney's Office not separate suable entity apart from Kenosha County itself); *Abraham v. Piechowski,* 13 F.Supp.2d 870, 879 (E.D.Wis. 1998) (sheriff's department part of county government not a separate suable entity). Even if the police department was suable it would be redundant to sue both the City and its police department. Therefore, the court will drop "City of Milwaukee Police Department" as a separate party and will refer to the City of Milwaukee as "defendant" throughout the remainder of this decision.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.* In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When both parties have moved for summary judgment, both are required to show no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously contend that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2720 at 327–28 (3d ed.1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty,* 239 F.2d 721, 723 (7th Cir.1957). Cross motions for summary judgment do not constitute a waiver of a trial. *See Miller v. LeSea Broadcasting, Inc.,* 87 F.3d 224, 230 (7th Cir.1996) (Posner, C.J.). The proper procedure is to assess the merits of each summary judgment motion independently. *See Santaella v. Metropolitan Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir.1997). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Wright, *supra,* at 335.

### IV. ALCOHOL TESTING

A. **General Nature of Fourth Amendment Analysis**

The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers and ef-

fects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. The Amendment is applicable to the states through the due process clause of the Fourteenth Amendment. *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). The basic purpose of the Fourteenth Amendment is to protect the privacy and dignity of the individual against unreasonable intrusions by the state and other governmental entities. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Schmerber v. California*, 384 U.S. 757, 769, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). To determine whether a particular intrusion is reasonable, and hence constitutional, a court must balance the intrusiveness of the search or seizure on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The test of reasonableness under the Fourth Amendment is not capable of "precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ The first question a court must determine in connection with a challenge to a search or seizure is whether the individual subjected to the intrusion is entitled to any Fourth Amendment protection in the first place. *T.L.O.*, 469 U.S. at 333, 105 S.Ct. 733. The court answers this question by deciding whether a plaintiff has a legitimate expectation of privacy in the context in which the intrusion was carried out. If the individual does have a reasonable expectation of privacy under the circumstances, the court characterizes the intrusion as a "search" or "seizure" within the meaning of the Fourth Amendment.

If the intrusion is determined to constitute a search or seizure the court must then determine whether the search or seizure was reasonable. *See* David A. Miller, *Mandatory Urinalysis Testing & the Privacy Rights of Subject Employees: Toward a General Rule of Legality Under the Fourth Amendment*, 48 U.Pitt.L.Rev. 201, 213 (1986). Generally, determining reasonableness is a two-step process that requires determining the relevant standard and then assessing whether the search or seizure in question met that standard. As the first step, the court must determine the circumstances, if any, under which a search or seizure of the type at issue can be carried out consistent with the Fourth Amendment. The court determines these circumstances by balancing the competing interests at stake. *See id.* at 214.

In assessing the interests on the individual's side of the balance, the court focuses primarily on the nature and extent of the intrusion. On the government's side of the balance, the court evaluates the justifications asserted by the government and also considers whether the search or seizure sufficiently contributes to the advancement of its stated ends in light of the alternative means available, *Prouse*, 440 U.S. at 659–61, 99 S.Ct. 1391, and whether the measures adopted to effectuate the search or seizure are no more intrusive than reasonably necessary to achieve its legitimate objectives, *Winston v. Lee*, 470 U.S. 753, 762–63, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

■ After evaluating the various interests on the side of the individual and the government the court determines the circumstances, if any, under which the search or seizure of the type involved would be reasonable under the Fourth Amendment. Generally, to be reasonable a search or seizure must be carried out pursuant to a warrant based on probable cause. A search or seizure without a warrant based on probable cause is presumptively unreasonable. *United States v.*

*Chadwick,* 433 U.S. 1, 9–11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Terry v. Ohio,* 392 U.S. 1, 28, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the warrant requirement may be dispensed with where "the burden of obtaining a warrant is likely to frustrate governmental purpose behind search," *Camara,* 387 U.S. at 533, 87 S.Ct. 1727, or where the court finds that a legitimate governmental purpose makes the intrusion into privacy reasonable, *see, e.g., Griffin v. Wisconsin,* 483 U.S. at 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *Miller, supra,* at 215.

If the warrant requirement is found to be incompatible with the search or seizure in question the court must select another less stringent standard against which to measure the facts. Courts have established four alternative standards. The most stringent alternative to the warrant/probable cause requirement is the independent probable cause standard. The other alternatives are the "reasonable suspicion" standard, the "mere suspicion" standard and the "unconstrained exercise of discretion" standard. *Miller, supra* at 215. It is up to the court to determine in light of the competing interests involved which standard the government must meet in order to comply with the reasonableness requirement of the Fourth Amendment.

Once the court determines the appropriate standard of legality the court then embarks on step two in the process of determining reasonableness. Here, the court applies the standard to the facts on which the search or seizure at issue was based to determine whether the standard has been met.

Applying this analysis to the present case, I inquire: (1) whether the alcohol tests were "searches" under the Fourth Amendment and, if so, by what standard their reasonableness should be judged; (2) whether the supervisors' acts of taking control of and transporting the suspected officers to police stations prior to administering the tests constituted "seizures" under the Fourth Amendment and, if so, by what standard their reasonableness should

be judged; and (3) if the plaintiffs were searched and seized, were the searches and seizures reasonable?

## B. Were the Alcohol Tests Searches and, if so, By What Standard Should Their Reasonableness be Judged?

 When a governmental body tests an employee for drug or alcohol use the Fourth Amendment is implicated even though the testing is unrelated to enforcement of the criminal law. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Searches and seizures by government employers of the private property of their employees are subject to the restraints of the Fourth Amendment. *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Further, the taking of a blood, urine or breath sample is a search under the Fourth Amendment. *Skinner,* 489 U.S. at 616, 109 S.Ct. 1402. "Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or deep lung breath for chemical analysis implicates concerns about bodily integrity," and, like the blood-alcohol test considered in *Schmerber,* constitutes a search. *Id.* at 617, 109 S.Ct. 1402.

Generally, a search must be carried out pursuant to a warrant based on probable cause. *Chadwick,* 433 U.S. at 9–11, 97 S.Ct. 2476. In an employment context, however, courts have held that in certain situations employee drug or alcohol testing may be undertaken without a warrant based on probable cause. *Skinner,* 489 U.S. at 624, 109 S.Ct. 1402. Courts have upheld testing based on reasonable suspicion where "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable," *O'Connor,* 480 U.S. at 725, 107 S.Ct. 1492 (quoting *T.L.O.,* 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring)).

In *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384,

103 L.Ed.2d 685 (1989), the Supreme Court upheld drug testing of Customs Service employees who received certain promotions. The court justified the departure from the probable cause/warrant requirement by citing two compelling governmental interests: (1) "ensuring that front line interdiction personnel are physically fit and have unimpeachable integrity and judgment;" and (2) ensuring that the public does not "bear the risk that employees who may suffer from impaired perception and judgment will be [in] positions where they may need to employ deadly force." *Id.* at 670–71, 109 S.Ct. 1384. Against these governmental interests the *Von Raab* court weighed the diminished expectation of privacy of Customs Service employees having such responsibilities. *Id.* at 672, 109 S.Ct. 1384; *see* 4 Wayne R. LaFave, *Search & Seizure* § 10.3(e) at 493 (3d ed.1996).

Other courts have upheld warrantless reasonable suspicion drug testing of public employees in safety sensitive positions based on logic similar to that invoked in *Von Raab.* One court reasoned as follows:

> [A] public employer has an important and legitimate interest in assuring that its employees abstain from drug use because drug use can impair job performance and put the public at risk. Moreover, a public employee must be regarded as having a diminished expectation of privacy in his or her role as an employee.

*Fraternal Order of Police v. Newark,* 216 N.J.Super. 461, 524 A.2d 430, 436 (App. Div.1987), *overruled on other grounds by New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 N.J. 531, 701 A.2d 1243 (1997); *Division 241, Amalgamated Transit Union (AFL—CIO) v. Suscy,* 538 F.2d 1264 (7th Cir.1976) (reasonable suspicion testing of bus drivers upheld based on need to protect public); *McDonell v. Hunter,* 612 F.Supp. 1122 (S.D.Iowa 1985) (prison guards under influence during working hours could present danger to security); *Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985)

(testing reasonable based on concern for safety of employees and of the general public); *see also Turner v. Fraternal Order of Police,* 500 A.2d 1005, 1009 (D.C. 1985) ("the lives of the public rest upon [police] alertness"); Miller, *supra,* at 217–18. Thus, there is significant precedent supporting testing employees in safety-sensitive jobs based on a standard of reasonable suspicion of substance abuse that could affect job performance.

█ The foregoing cases and others make clear that the only legitimate justification for testing such employees based on a standard other than a warrant based on probable cause is a well-founded concern about public safety. Public safety is the most compelling factor on the government's side of the balance. Thus, testing based on a goal other than public safety such as, for example, increasing productivity, would be unreasonable because the objective of enhanced productivity lacks sufficient importance when viewed in light of the intrusiveness of the testing and the fact that employee productivity can be measured in other ways.

The case before me presents the issue of whether it is reasonable to test government employees in safety-sensitive positions for excessive use of alcohol while the employees are off duty. A number of cases have addressed the issue of testing for off-duty drug use. These cases generally support the conclusion that testing is permissible where off-duty drug use might create a danger to public safety. *See Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (government has compelling interest in ensuring that certain employees do not use drugs off duty, for such use creates risks of bribery and blackmail); *AFGE v. Martin,* 969 F.2d 788 (9th Cir. 1992) (upholding testing for off-duty drug use by Department of Labor employees in public health and safety-sensitive positions); *Division 241,* 538 F.2d at 1264 (upholding testing of bus and train operators suspected of reporting for duty or being on duty while under influence of alcohol or drugs); *Palm Bay v. Bauman,* 475 So.2d 1322 ( Fla.Dist.Ct.App.1985)

(testing for off-duty drug use by police reasonable based on short and long-term physical, mental and psychological effects of drugs and on need to have police officers abide by the laws they enforce); *see also* 73 Op. Att'y Gen. of Wis. 74 (1984) (sheriff's department may require officer to take breathalyzer or blood test if officer appears to be under influence of intoxicants or drugs when the officer reports for duty or on duty).

The cases and commentary suggest that there are two types of dangers to public safety created by the off-duty use of drugs by employees in security-sensitive positions. First, drug use causes short and long term physical and mental effects and may not be easily compartmentalized into solely off-duty consequences. Therefore, an employer has a legitimate interest in employee drug use whenever it occurs. *See* 4 LaFave, *supra*, § 10.3(e) at 497. Second, because drugs are illegal, an employee in a security-sensitive position who used drugs off duty could constitute a threat to public safety because of his or her vulnerability to bribery or blackmail resulting from involvement in criminal activity. *Von Raab*, 489 U.S. at 670–7, 109 S.Ct. 1384. While an intoxicated employee in a safety sensitive position who had to perform job related duties would endanger public safety, the use of alcohol, unlike drug use, does not implicate concerns about bribery or blackmail because it is not illegal to use (or even to abuse) alcohol.

Some cases and commentators suggest that police officers are always subject to duty and that therefore testing for suspected off-duty intoxication is always reasonable. *See, e.g., Bauman*, 475 So.2d at 1322. Regarding *Bauman* one commentator stated:

> Thus, although the court does not acknowledge it, the purpose of the city's policies is to prohibit police officers and fire fighters from working while under the influence of drugs. Since most fire fighters and all police officers employed by the city are either on duty or subject to immediate call to duty twenty-four hours a day, these employees must re-

frain from drug or alcohol use at all times. Therefore, in the case of an employee whose professional life is effectively coextensive with his private life, a broader urinalysis scheme is consistent with the general rule of legality, insofar as it seeks only to prevent on-the-job impairment.

Miller, *supra*, at 226.

■ Police officers are subject to a broader testing rule than employees in non-safety-sensitive positions because (as already observed) an intoxicated police officer performing police duties would endanger public safety. It does not follow, however, that any testing is ipso facto reasonable because it involves police officers. While the fact that police officers are being tested may affect the meaning of "reasonableness" when the officers' rights are being considered, *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 885 (9th Cir.1990), police officers "are not relegated to a watered-down version of Constitutional rights," *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Police officers are not "required to tolerate invasions of their freedoms which are not reasonably related to the special considerations arising from the relationship of employment." *Biehunik v. Felicetta*, 441 F.2d 228, 231 (2d Cir. 1971).

■ Based on the foregoing discussion I deduce the following standard by which to judge the reasonableness under the Fourth Amendment of the alcohol tests in the present case: the tests will be considered reasonable if they were based on reasonable suspicion that the officers were intoxicated under circumstances where the officers' intoxication presented a danger to public safety.

## C. Did the Taking Control of and Transportation of Officers to Testing Sites Constitute Seizures and, if so, by What Standard Should Their Reasonableness be Judged?

Prior to being tested the plaintiffs were confronted by police supervisors and com-

pelled to accompany the supervisors in squad cars to police stations where the tests were administered. The parties disagree as to whether the supervisors' acts of taking control of and transporting the plaintiffs constituted "seizures" under the Fourth Amendment. In *Skinner* the court addressed a similar issue as follows:

> Our precedents teach that where, as here, the Government seeks to obtain physical evidence from a person the Fourth Amendment may be relevant at several levels. The initial detention necessary to procure the evidence may be a seizure of the person, if the detention amounts to a meaningful interference with his freedom of movement.

*Skinner,* 489 U.S. at 616, 109 S.Ct. 1402 (internal citations omitted). The *Skinner* court, however, concluded that because the actual testing constituted a "search" under the Fourth Amendment it was unnecessary to determine:

> whether the employer's antecedent interference with the employee's freedom of movement was an independent Fourth Amendment seizure.... For present purposes, it suffices to note that any limitation on an employee's freedom of movement that is necessary to obtain the blood, urine or breath samples ... must be considered in assessing the intrusiveness of the searches effected by the Government's testing program.

*Id.* at 618, 109 S.Ct. 1402.

Arguably, under *Skinner,* it is unnecessary to address the issue of whether the supervisors' taking control of and transportation of plaintiffs constituted independent Fourth Amendment seizures as long as in addressing the reasonableness of the searches I consider the added intrusiveness of the interference with the employees' freedom. However, in the present case, the interference with the officers' freedom antecedent to the searches occurred well before the tests were administered. Additionally, the restriction with the officers' freedom arguably amounted "to a meaningful interference" with the officers' freedom of movement. Therefore,

I will address the question of whether such interference constituted independent seizures.

■ In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), the court stated that a person was seized within the meaning of the Fourth Amendment if, under the circumstances, a reasonable person would have believed that he was not free to leave. See also *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where the *Mendenhall* definition of a seizure was endorsed by a majority of the court. Based on the foregoing definition of "seizure" it is clear that the plaintiffs in the case before me were seized. Police supervisors ordered the plaintiffs to accompany them to police stations. These orders are strong indicators that seizures occurred. *See United States v. Guana–Sanchez,* 484 F.2d 590, 591–92 (7th Cir.1973). Pursuant to the testing rule, plaintiffs had no choice but to submit to the supervisors' orders or face discipline up to and including discharge. Moreover, the supervisors made it clear to plaintiffs that they were not free to leave. They would not even let Lindsey wash his face, permit Docter go to the bathroom unaccompanied, or allow Barwinski–Gipp to retrieve her coat from the restaurant by herself. In addition, they refused Grow's request that they leave his house. Under such circumstances no reasonable person in plaintiffs' positions would have believed that he or she was free to leave.

■ Defendant argues that plaintiffs were not seized under the Fourth Amendment because they were not arrested. However, a person can be seized without being arrested. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (a person is seized when his freedom to walk away is restrained regardless of whether a formal arrest occurs). Defendant also argues that plaintiffs were not seized because they were threatened only with job loss and not physical force. But all that is necessary to effectuate a seizure is a

"show of authority" which in some way restrains the liberty of a citizen. *Id.* at 19 n. 16, 88 S.Ct. 1868. Here, the supervisors, representing the police department, clearly showed their authority, and plaintiffs submitted to the authority. *See California v. Hodari,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (seizure occurs when suspect submits to show of authority); *see also Angara v. City of Chicago,* 897 F.Supp. 355 (N.D.Ill.1995) (employee who arrived at work and was ordered into car and taken to a room for interrogation and not permitted to use the restroom unescorted was seized). Thus, plaintiffs were subjected to independent seizures under the Fourth Amendment.

The Fourth Amendment requires that seizures, like searches, be reasonable. Thus, as with respect to the searches, I must determine what standard is appropriate for determining whether the seizures were reasonable. Again, I determine this standard by balancing the governmental justifications for the seizure against the nature and extent of the intrusion. The justification asserted by the government for the seizures is identical to that supporting the searches: intoxicated police officers endanger public safety, making the alcohol testing reasonable. Further, the seizures are necessary because the testing devices are not mobile. Thus, the officers must be transported to police stations where the tests are administered. On the individual's side of the balance, the seizures constitute substantial intrusions into plaintiffs' privacy. The seizures are, in fact, considerably more intrusive than the searches. The supervisors confronted plaintiffs in different places, in two cases in their homes, and took them to police stations for substantial periods of time.

■ Plaintiffs argue that the appropriate standard for measuring the reasonableness of the seizures is the warrant/probable cause standard. However, as previously discussed, in the employment context, particularly where employees in safety-sensitive positions are involved, testing is permissible based on the lesser reasonable suspicion standard. Additionally, the sole purpose of the seizures was to enable the defendant to administer the alcohol tests. It would be illogical and incongruous to use different standards for determining the reasonableness of the seizures and the searches when both are part of the same testing procedure. Therefore, I will measure the reasonableness of the seizures by the standard previously stated: the seizures will be considered reasonable if the defendant had reasonable suspicion that the officers were intoxicated under circumstances when the officers' intoxication presented a danger to public safety.

## D. Were the Seizures and Searches Reasonable?

Both parties have moved for summary judgment on the issue of the reasonableness of the seizures and searches. As previously discussed, I may grant summary judgment for either party only if there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.Proc. 56(c), and evaluate independently whether each party has satisfied its burden on its own summary judgment motion under the summary judgment standard. In analyzing the motions for summary judgment I apply to the evidence in the record the standard of reasonableness previously announced.

The first part of the standard asks whether the supervisors had reasonable suspicion that the officers were intoxicated. With respect to plaintiffs Lindsey, Docter and Grow the evidence in the record is that two supervisors observed each officer for evidence of intoxication prior to transporting the officer to the police station. In each case the supervisors observed a number of physical signs of intoxication. Plaintiffs do not dispute that the supervisors made these observations or that the observations amounted to reasonable suspicion of intoxication. In the case of Barwinski–Gipp the supervisors found the plaintiff in a bar. They asked her if she

had been drinking and she responded that she had been "drinking a lot." Although she intended this statement to be sarcastic, the supervisors did not interpret it that way. However intended, the statement was sufficient to create reasonable suspicion of intoxication. Therefore, I conclude that with respect to each plaintiff the supervisors had reasonable suspicion of intoxication.

■ The second part of the standard asks whether the officers were suspected of intoxication under circumstances where intoxication presented a danger to the public. In support of their argument that the seizures were unreasonable, plaintiffs present evidence that they were off duty. In support of its argument that the seizures were reasonable, defendant presents as evidence MPD Rule 4 § 2/025.00 which, as discussed above, provides that police officers are "always subject to duty" even when off duty. The subject to duty rule states that police officers will have "regular hours ... [of] active duty" and "when not so employed shall be considered 'off duty.' " (MPD Rule 4 § 2/025.00.) The rule further contemplates that the "normal" work week will be five "eight hour shift[s]." *Id.* The rule provides, however, that officers are "always subject to duty," and specifies three ways in which off-duty officers may be required to go from off-duty to on-duty status. Officers could (1) receive "orders from proper authority," (2) be summoned by a "call from civilians," or (3) a matter could come "to their attention at any time." *Id.* The defendant contends that pursuant to the subject to duty rule off-duty officers might be required to perform police duties at any time, hence alcohol testing based on reasonable suspicion of intoxication is reasonable at any time.

I consider the cases of Docter and Barwinski–Gipp first and ask whether they were suspected of being intoxicated under circumstances where intoxication presented a danger to public safety. When suspected of intoxication Docter (who for present purposes I assume remained off duty even under the subject to duty rule

notwithstanding her attempt to stop a fight) and Barwinski–Gipp were in public places. Docter was attending an ethnic festival and Barwinski–Gipp was in a restaurant. It cannot be disputed that an off-duty police officer in a public place might reasonably encounter a situation requiring the officer to perform police duties. An officer in a public place could have a police matter come to his or her attention as contemplated by the subject to duty rule.

Defendant cites several cases arising out of incidents involving off-duty police officers. *See, e.g., Soller v. Moore*, 84 F.3d 964 (7th Cir.1996) (fatal shooting by off-duty Milwaukee police officer pursuing an erratic driver); *Davis v. Murphy*, 559 F.2d 1098 (7th Cir.1977) (alleged unlawful arrest by off-duty officer). These cases are useful only in that they illustrate that off-duty police officers do from time to time find themselves· in situations where it is appropriate for them to intervene. They might encounter a crime, a fight, an argument, a car accident or any number of situations requiring them to respond as police officers. Further, officers encountering such situations have no option but to intervene. The subject to duty rule mandates that they take "required police action in any matter coming to their attention at any time." Docter's case is, in fact, the perfect example of the predicament created by an intoxicated police officer who might have to perform police duties. Docter was at a picnic when a fight broke out. She approached the fight and ended up being struck in the head.

Although off-duty officers may encounter such situations infrequently, it is critical that when emergencies do occur officers be prepared for them. Situations requiring emergency police action may involve life and death. Public safety requires that off-duty officers who encounter emergencies be capable of responding competently. If an off-duty officer encountered such a situation in a state of intoxication the officer would endanger public safety.

When suspected of intoxication Docter and Barwinski–Gipp were in public places and might have had to perform police duties. Thus, they were seized under circumstances where, if intoxicated, they would have presented a danger to the public. Further, while in public places they had diminished expectations of privacy. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Therefore, the supervisors' seizures and searches of Docter and Barwinski–Gipp were reasonable under the standard of reasonableness previously announced—no rational jury could find that the seizures of Docter and Barwinski–Gipp were unreasonable. Therefore, plaintiffs' motion for summary judgment with respect to these two plaintiffs will be denied and defendant's motion will be granted.

 I next address the summary judgment motions in the cases of Lindsey and Grow. Plaintiffs present evidence that when they were suspected of being intoxicated neither officer was in a public place. Both Lindsey and Grow were off duty and at home. Lindsey was in bed sleeping and Grow was sitting in a chair in his basement. Both officers had recently come home from work and neither was required to report to work again for a substantial period of time.

I note that while police officers have a diminished expectation of privacy, their expectation is perhaps less diminished when they are in their own homes. *See Gates,* 907 F.2d at 884 ("Nowhere is the protective force of the [F]ourth [A]mendment more powerful than it is when the sanctity of the home is involved.... The sanctity of a person's home, perhaps our last real retreat in this technological age, lies a the very core of the rights which animate the [A]mendment." (citations omitted)); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 474, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (recognizing the distinction between searches and seizures that take place at a person's home or office and other searches and seizures).

Plaintiffs argue that because they were at home their intoxication presented no danger to public safety, thus the seizures of them were unreasonable. Defendant again counters with the subject to duty rule and argues that because plaintiffs are always subject to duty they can reasonably be tested for alcohol at any time. Again, the rule provides three ways in which an off-duty officer may be called to on-duty status: the officer could receive orders from a superior, a call from civilians or encounter a situation directly. It would appear to be unlikely for an off-duty officer inside his home to receive a call from civilians or to directly encounter an incident. While, of course, it is possible that an officer could look out the window and see a neighbor's house being burglarized, this possibility seems remote. However, under the subject to duty rule it is at least theoretically possible that an off-duty officer at home could be activated by a call from a superior officer.

The record is unclear as to whether in the real world of Milwaukee police work off-duty officers are ever called in to work by the department. Plaintiffs argue that this never or almost never occurs. Plaintiffs may be correct, because the rule includes no requirement that police officers be accessible to the department while off duty or even that they remain in or near the City of Milwaukee. If it is true that off-duty officers are never or almost never called in to work, then an off-duty officer who is intoxicated while at home would not be likely to constitute a danger to public safety. However, on plaintiffs' motion for summary judgment I must draw all inferences in favor of defendant. A reasonable jury could find based on the existence of the subject to duty rule that an officer could be called on duty. There is no evidence in the record with respect to whether or how often the rule is invoked. In the absence of evidence that off-duty officers are rarely, if ever, called on duty by the department I cannot grant the plaintiffs' summary judgment motion.

By the same token I must also deny defendant's motion for summary judgment. In support of its motion defendant presents only the subject to duty rule. While the rule is enough to enable defendant to withstand plaintiffs' motion for summary judgment, it is not enough to justify granting defendant's motion. On defendant's motion I must draw all inferences in favor of plaintiffs. Plaintiffs have presented evidence that while off duty they were subjected to highly intrusive seizures that apprehended and removed them from their own homes at a time when it appears unlikely that they would have been suddenly called it to work. This is sufficient to enable them to withstand defendant's summary judgment motion.

Thus, with respect to Lindsey and Grow, on the sole issue of the application of the reasonableness of the searches and seizures, the summary judgment motions of both plaintiffs and defendant will be denied. The question of whether, at the time seized, Lindsey and Grow presented a danger to public safety presents issues of fact that are not presently resolved.

In order to provide some additional guidance to the parties for purposes of trial, I make several observations about applying the "danger to public safety" part of the standard to police officers who are at home. It is important to emphasize that the danger must arise from the officer's employment relationship as it is the special needs resulting from the employment relationship which make the warrant and probable cause requirements impracticable. *O'Connor*, 480 U.S. at 722–23, 107 S.Ct. 1492. Thus, the mere presence of a gun in a police officer's home would not constitute a danger to public safety because having a gun in a home is not particularly unique to police officers. Many citizens, some of whom might sometimes even become intoxicated, have guns in their homes. Yet this would not justify going to their homes and seizing them.

Similarly, although there is no evidence of domestic abuse by either Lindsey or Grow, even if there had been such evidence it would not justify a seizure of the type that occurred here. Again, the seizure here was for the sole purpose of administering an alcohol test relating to the officers' ability to perform their jobs, and can only be justified by reasons relating thereto. If the police had probable cause to believe that plaintiffs had committed crimes they could have arrested them as they could any citizen. The alcohol testing rule may not be used as a way around the requirements of an arrest warrant or probable cause to arrest police officers who are suspected of having violated laws.

Finally, to meet the "danger to public safety" test, the police must show that the danger presented is relatively immediate. It would not be sufficient, for example, to argue that an officer's intoxication indicates that the officer has a serious drinking problem, which in the long run makes the officer dangerous. While the police department surely has a legitimate interest in knowing whether an officer is an alcoholic, the possibility that this is so would not justify entering the officer's home and removing him against his will for the purpose of testing him. There are less intrusive ways for the department to discover if the officer is a chronic drinker, including close monitoring of job performance and, if justified, on-duty alcohol testing.

## V. ENTRY INTO AND SEARCH OF GROW'S HOME

Plaintiff Grow claims that in addition to unlawfully seizing him, the supervisors also violated his Fourth Amendment rights by illegally entering his home, illegally searching the home and removing several items. Defendant concedes that when the officers entered Grow's home they did not have an arrest or search warrant, did not have probable cause to believe that a crime was being committed, and did not have the consent of any resident to enter.

If the police enter private premises for the purpose of making an

arrest they must at a minimum have probable cause to believe that the person sought has committed a crime. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Further, a search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on exigent circumstances. *Coolidge,* 403 U.S. at 474–75, 91 S.Ct. 2022. Exigent circumstances, however, only excuse the failure to obtain a warrant and are not a substitute for probable cause. For exigent circumstances to justify an entry into a home there must be a "compelling need for official action and no time to secure a warrant." *United States v. Marshall,* 157 F.3d 477, 482 (7th Cir.1998).

Defendant suggests that exigent circumstances justified the entry into Grow's home. One kind of exigency is if the police reasonably believe that the safety of others may be threatened. *United States v. Ware,* 914 F.2d 997, 1000–01 (7th Cir. 1990). Here, however, there is no evidence that the police were told that a person in the home was in need of immediate aid. There is no evidence that anyone was in danger. Prior to entering the house they called for a response and received none. Thus, this case is unlike those cited by the defendant, including *United States v. Warden,* 886 F.Supp. 813, 815, 817 (D.Kan.1995) (door answered by defendant's daughter who motioned for police to come in quickly); *United States v. Guarente,* 810 F.Supp. 350, 351 (D.Me. 1993) (officers received 911 call regarding domestic dispute and when they arrived heard man yelling "he's got a gun"); *Magnuson v. Cassarella,* 813 F.Supp. 1321, 1323 (N.D.Ill.1992) (where the officer heard screams coming from the house).

▮ In the present case no such circumstances existed. At no time was Grow alleged to have committed any abusive act or to have made any threat. Further, the officers' behavior suggests that they themselves were aware that they had no basis for entering the house. Before entering, they posted themselves at the door and attempted to use a knock and talk technique to obtain permission to make a warrantless entry into a residence. *See United States v. Johnson,* 170 F.3d 708 (7th Cir.1999). Only after this failed did they enter. Had a threat to life or limb truly existed the officers would have entered the house immediately.

Exigent circumstances may also exist if the delay necessary to obtain a warrant, under the circumstances, threatens the destruction of evidence. *See* 3 LaFave § 6.5(a) at 337. Defendant has not provided any facts suggesting that there was any evidence of a crime much less that such evidence was threatened with destruction. Thus, there were no exigent circumstances for the entry. Therefore, the supervisors' entry into Grow's home violated his rights under the Fourth Amendment. Before the supervisors left Grow's home they searched it and removed several items. They did not have a search warrant nor was the search conducted pursuant to a lawful arrest. Therefore, the search of Grow's home and the seizure of the unloaded shotgun and his police badge and service revolver also violated his rights under the Fourth Amendment.

## VI. MUNICIPAL LIABILITY

▮ Municipalities are subject to suit under 42 U.S.C. § 1983. However, municipalities cannot be held liable under § 1983 on a respondeat superior theory. *Monell v. Department of Soc. Serv. of New York,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities are liable only for acts for which they are responsible, meaning acts they have embraced as policy or custom. *Id.* at 690–91, 694, 98 S.Ct. 2018. To show such responsibility, plaintiffs must prove (1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amounting to an unconstitutional practice so perma-

nent, well-settled and known to the City of Milwaukee as to constitute a "custom or usage" with the force of law; or (3) the conduct was caused by a decision of a municipal policymaker with final policy-making authority in the case in question. *McTigue v. Chicago,* 60 F.3d 381, 382 (7th Cir.1995); *see Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018.

■ In the present case the City of Milwaukee has an express policy requiring police officers, whether on or off duty, to submit to alcohol tests whenever two supervisors observing the officer have a reasonable suspicion to believe that the member is intoxicated. The policy necessarily requires that suspected officers be taken to police stations where the tests are administered, because it is understood by police officers that that is where the tests take place. The policy makes no exception for officers suspected of being intoxicated in their homes. The seizures of Lindsey and Grow were conducted pursuant to this express policy. If the seizures are ultimately determined to have been unreasonable, the City may properly be held liable for the deprivations of constitutional rights.

■ I reach a different conclusion, however, with respect to the supervisors' entry into and search of Grow's home. The department's alcohol testing rule does not include a policy endorsing entering or searching residences without consent. Additionally, plaintiffs have presented no evidence that this entry and search was one of a series of incidents amounting to a permanent and well-settled unconstitutional practice. Plaintiffs have shown only a single instance of misconduct by officers not in policy-making positions. Where the policy itself is not unconstitutional and no policymaker is specifically involved, "considerably more proof than the single incident is necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation." *Oklahoma City v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). To infer the existence of a City policy from the entry into and search of Grow's house and hold the City liable on the basis of that policy would amount to the type of respondeat superior liability precluded by *Monell. See City of Canton v. Harris,* 489 U.S. 378, 399–400, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

## VII. OTHER PRETRIAL MOTIONS

Prior to the filing of both summary judgment motions, plaintiffs filed a motion to preclude defense witnesses and defendant filed a motion in limine. Because of the parties positions regarding those motions may be affected by the decision rendered today on the summary judgment motions, the court will at this time deny the motion to preclude and the motion in limine without prejudice. If the parties wish to renew these motions as trial approaches they may do so.

### *ORDER*

For the reasons stated above,

**IT IS HEREBY ORDERED** that the defendant City of Milwaukee Police Department is **DISMISSED** as a defendant in the case.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment (R. 56) is **DENIED.**

**IT IS FURTHER ORDERED** that the defendant City of Milwaukee's motion for summary judgment (R. 45) is **GRANTED** with respect to the claims of plaintiffs Docter and Barwinski–Gipp; is **DENIED** with respect to the claim of plaintiff Lindsey and, with respect to the claims of plaintiff Grow, is **DENIED** as to the claim of unreasonable search and seizure of his person, and **GRANTED** as to the claim of illegal entry into and search of his home.

**IN ADDITION, IT IS ORDERED** that, pursuant to Fed.R.Civ.P. 56(d), the facts regarding whether Lindsey and Grow were searched and seized are uncontroverted, and those issues are resolved as set

forth above; the only issue for trial is the reasonableness of those searches and seizures using the "danger to public safety" test.

**FINALLY, IT IS ORDERED** that plaintiffs' motion to preclude defense witnesses (R. 28) and defendant's motion in limine (R. 36) are **DENIED WITHOUT PREJUDICE.**